UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN ANDREW ZINDA, Jr.,

Petitioner,

vs.

SCOTT FRAUENHEIM,

Respondent.

No. 2:15-cv-1611-KJM-EFB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner and has filed, through his counsel, a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction for second degree murder[1] entered against him on December 11, 2012 in the Sacramento County Superior Court. He seeks federal habeas relief on the ground that the trial court erred by failing to sua sponte instruct the jury on defenses of justifiable homicide in making an arrest and mistake of fact. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

**I. Background**

In a memorandum and opinion certified for partial publication, the California Court of Appeal for the Third Appellate District affirmed petitioner's judgment of conviction and provided the following factual summary:

---

[1] Petitioner was also found to have used a deadly weapon during the commission of the crime and was given an enhancement pursuant to Cal. Penal Code § 12022 (b)(1).

1

Defendant Steven Andrew Zinda chased David Valdez into a field and murdered him with an axe. Tragically, a poor decision placed Valdez in the wrong place at the wrong time. After drinking with some friends at a house in Rio Linda, Valdez decided to leave around 2:00 a.m. He was intoxicated and did not make it very far before driving his Honda Passport into a ditch near defendant's house. Valdez stayed with his vehicle while two friends left in a truck to get some tow chains. Meanwhile, defendant's house was being burglarized. Defendant stayed the night at a friend's house, but had reason to believe certain neighborhood gang members wanted to steal from him, so he set his alarm for 3:00 a.m. and stopped by his house to check on it before his early morning work shift. He arrived to find the burglary in progress. One burglar fled to a waiting car and drove away. Defendant went into his house, grabbed an axe from inside, and came back out. He then saw Valdez waiting for his friends on the side of the road. Assuming Valdez was one of the burglars, defendant walked out to him with the axe and yelled: "Did your buddies leave you, man?" Valdez ran. Defendant took this to be an admission of guilt and gave chase with the axe. When he caught up to Valdez in a field about a quarter mile away, defendant swung the axe and either "missed him the first time" or "got him like in the shoulder or maybe his upper body." He then grappled with Valdez on the ground, "givin['] him elbows," and swung the axe a second time, which "gashed him up on his face." Defendant then hit Valdez with the axe "one or two more times ... to finish it off."

Defendant was convicted by jury of second degree murder and found to have personally used a deadly weapon during the commission of the crime. He was sentenced to serve an indeterminate prison term of 15 years to life plus a consecutive determinate term of one year.

On appeal, defendant contends the trial court (1) erred by not instructing the jury, sua sponte, on (a) justifiable homicide in making an arrest, and (b) mistake of fact; (2) erroneously instructed the jury on heat of passion voluntary manslaughter; and (3) erroneously excluded "evidence that [Valdez] claimed a gang affiliation, and photographs which either suggested a gang affiliation or gave a more accurate and neutral portrait of the victim near the time of his death."

We affirm the judgment. As we explain, defendant was not entitled to a sua sponte instruction on justifiable homicide in making an arrest or on mistake of fact. The justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Such a theory was also inconsistent with defendant's theory of the case, i.e., while defendant killed Valdez unlawfully, the crime was not murder but voluntary manslaughter. The mistake of fact instruction also lacks evidentiary support because defendant's erroneous belief Valdez was involved in the burglary does not make killing him with multiple axe blows an innocent act. Nor is mistake of fact a true affirmative defense implicating the trial court's sua sponte

instructional duties. We need not determine whether the trial court erroneously instructed the jury on heat of passion voluntary manslaughter because defendant was not entitled to voluntary manslaughter instructions. Nor did the trial court abuse its discretion by excluding the proffered photographic evidence and other evidence Valdez claimed a gang affiliation.[2]

**FACTS**

On the night of March 19, 2011, Valdez and a close friend, Justin Trammell, went to a house in Rio Linda where they drank alcohol and played cards with friends. Valdez and Trammell rode to the house together in Valdez's Honda Passport, a midsize SUV. Valdez drove and brought over a large bottle of rum. Renee Ross was in charge of the house for the night; she was watching her three half sisters while her father and stepmother were out of town. Ross's boyfriend, Craig Seagrove, was also at the house, as were several other people. Ross apparently collected car keys since they would be drinking.

Around 2:00 a.m., Valdez and Trammell decided to leave. They were intoxicated. Ross tried to keep them from leaving, but Valdez "got the keys back" and walked out of the house carrying the bottle of rum. Trammell followed. So did Seagrove. Valdez and Trammell left in the Passport, which did not make it very far before sliding off the road and into a ditch. Seagrove witnessed the crash from the driveway and walked over to the Passport as Valdez spun the tires in the mud. At 2:51 a.m., after various unsuccessful attempts to extricate the vehicle from the ditch, Valdez called another friend, Cory Rossbo, and asked him to bring his four-wheel-drive Chevrolet truck to pull the Passport out of the ditch. Rossbo agreed. Seagrove went back to the house. When Rossbo arrived about 10 minutes later, he realized he did not have the proper equipment, so Trammell got into the Chevrolet and the two drove to Trammell's house to pick up tow chains. Valdez stayed with his vehicle.

On the way to Trammell's house, Rossbo noticed a nearby house's garage door was open and two men were walking around in the garage. The house belonged to defendant, who had stayed the night at a friend's house after watching a pay-per-view UFC (Ultimate Fighting Championship) fight. The people in the garage were burglars. Defendant, who believed his house was in danger of being burglarized by neighborhood gang members, had set his alarm for 3:00 a.m. so he could check on his house before his early morning work shift. He arrived around 3:15 a.m. to find a small white car parked in front of his house and the garage door wide open. Defendant pulled into his driveway and ran into the house through the

---

[2] This syntax in the second half of this sentence is slightly confusing. The court of appeal appears to be stating that the trial court did not abuse its discretion in excluding evidence that Valdez may have been affiliated with a gang. [footnote not in original]

garage. Hearing the front door shut as he entered the house, defendant grabbed a golf club and ran out the front door. One of the burglars was getting into the white car. Defendant gave chase and hit the car with the golf club as it drove away. He then returned to the house, shut the garage door, and assessed what had been taken in the burglary. A short time later, defendant went back outside, this time with an axe, and noticed Valdez on the side of the road a short distance from the house.

Defendant assumed Valdez was involved in the burglary, walked over to him carrying the axe, and yelled: "Hey what happened to you? Did your buddies leave you, man?" Valdez ran. Defendant took this to be an acknowledgment of guilt and gave chase with the axe. He described the pursuit: "I'm runnin ['] with my axe, dude, ... right behind him and shit, dude, and he's getting all tired, dude. He's goin['] on both sides of the road and shit, like not knowin['] where to ... go, dude." Defendant caught up to Valdez about a quarter mile away. Valdez climbed a fence in an attempt to escape through a field, but fell over the top of the fence and landed on the ground. Defendant reached the fence about the same time, entered the field through a gate, and confronted Valdez: "You tryin['] to rob my house, man?" He then "took a swing at him." Defendant elaborated: "I hit him with the axe the first time or I think I mighta missed him a little bit, but maybe got him in the upper body and then ... I'm scufflin['] around with him, dude I'm givin['] him elbows, dude, that's close combat, dude." Defendant then swung the axe a second time, which "gashed him up on his face," followed by "one or two more" swings of the axe "to finish it off." Defendant kicked Valdez in the back before returning to his house.

Meanwhile, when Trammell and Rossbo got to Trammell's house to pick up the tow chains, they discovered Trammell's horses had escaped from their enclosure. Collecting the horses took at least an hour. At 3:41 a.m., Rossbo called Valdez to let him know they would be late with the tow chains, but Valdez did not answer his cell phone. Around 4:00 a.m., after the horses were put away, Trammell called Valdez several times. Again, no one answered. Trammell and Rossbo then returned to the Passport with the tow chains. There was no sign of Valdez. Assuming he had gone to a girlfriend's house, which was nearby, Trammell and Rossbo abandoned the mission and returned to their respective homes.

Around the same time, defendant called his sister and told her what had happened. He called 911 about 30 minutes later. When sheriff's deputies arrived, defendant directed them to Valdez's body, indicating he believed Valdez to be a member of a local street gang called the Boss Hoggs. Valdez was pronounced dead at the scene. Later in the morning, defendant gave a full statement to Detective Stanley Swisher. His account of events was that described above. During the interview, defendant also stated he "always kinda had problems" with neighborhood "gang bangers" who claimed to be affiliated with a Southern California street gang called the Pirus. When Detective Swisher posited the scenario that Valdez was

4

> simply waiting for his friends to arrive to pull his car out of the ditch when defendant came home to find his house being burglarized by other people, and ran not because he was involved in the burglary, but rather because defendant was "pissed off" and coming at him with a "big axe," defendant said he would be "devastated" if he killed Valdez for the wrong reasons.

*People v. Zinda*, 233 Cal. App. 4th 871, 873-76 (2015), review denied (Apr. 29, 2015). Petitioner raised this jury instruction claim with the California Supreme Court and it was summarily denied. Lodg. Doc. No. 10 (Petition for Review); Lodg. Doc. No. 11 (Order Summarily Denying Petition for Review).

**II. Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining

what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

6

*Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

7

*Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III. Petitioner's Claim**

Petitioner argues that he was denied due process when the trial court failed to offer a sua sponte jury instruction on the defenses of justifiable homicide in an attempt to arrest a burglary suspect and mistake of fact. ECF No. 1 at 22.[4] Specifically, he points to the Fourteenth Amendment's requirement[5] that defendants be afforded a meaningful opportunity to present a

---

[4] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

[5] "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a

8

complete defense and claims that this opportunity was denied him by the trial court's failure to offer the aforementioned instructions. *Id.* The Court of Appeal, however, held that the trial court did not err by failing to offer these instructions:

> **Failure to Instruct on Defenses**
>
> Defendant contends the trial court erred by not instructing the jury, sua sponte, on two defenses: justifiable homicide in making an arrest, and mistake of fact. He is mistaken.
>
> "A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.] ... [A] trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on ..., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517, [61 Cal.Rptr.3d 526, 161 P.3d 58].)
>
> **Justifiable Homicide in Making an Arrest**
>
> Penal Code section 197 provides in relevant part that homicide is justifiable "[w]hen necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed ...."1 (§ 197, subd. (4).)
>
> There appears to be disagreement in the appellate decisions interpreting this provision as to the meaning of "any felony." In *People v. Piorkowski* (1974) 41 Cal.App.3d 324, [115 Cal.Rptr. 830] (*Piorkowski* ), the Second District Court of Appeal explained: "At common law, one could use deadly force to prevent the commission of a felony. [Citation.] Statutory expansion of the class of crimes punishable as felonies has made the common law rule manifestly too broad. [Citation.] It appears that the principle that deadly force may be directed toward the arrest of a felon is a correct statement of the law *only where the felony committed is one which threatens death or great bodily harm.* [Citation.]" (*Id.* at pp. 328–329, 115 Cal.Rptr. 830, italics added.) There, the victim and two accomplices entered a dry cleaning establishment during business hours and stole a dollar bill from the counter and a wallet from a purse that was behind the counter. (*Id.* at p. 328, 115 Cal.Rptr. 830.) The court held, "the character of the crime and the manner of its perpetration did not warrant the use of deadly force to effect the [victim's] arrest, i.e., [the homicide] was not 'necessarily committed,' " and explained: "While this factual pattern may

---

complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

9

constitute 'statutory burglary,' which is a felony [citation] clearly there is not the attendant risk to human life which accompanies common law burglary." (*Id.* at p. 330, 115 Cal.Rptr. 830.)

In *People v. Quesada* (1980) 113 Cal.App.3d 533, [169 Cal.Rptr. 881] (Quesada ), the First District Court of Appeal applied the reasoning of *Piorkowski*, supra, 41 Cal.App.3d 324, 115 Cal.Rptr. 830 to a homicide committed while the defendant attempted to apprehend a person suspected of burglarizing his unoccupied home two days earlier. The defendant engaged others to buy a stereo from the suspect, confirmed the stereo had been stolen from his apartment, and tried to make an arrest. When the suspect drove away, the defendant shot and killed him. (*Quesada*, supra, at pp. 536–537, 169 Cal.Rptr. 881.) The court held the trial court did not err in refusing to instruct the jury that "homicide is justifiable 'when necessarily committed in attempting, by lawful ways and means, to apprehend any person who has committed burglary of the first degree.' " (*Id.* at pp. 537, 540, 169 Cal.Rptr. 881.) The court explained that "since a burglary committed when no one is on the premises is not a crime which threatens death or serious bodily harm so as to justify the use of deadly force in preventing its occurrence," for example, one may not justifiably use a trap gun to prevent a burglary (*People v. Ceballos* (1974) 12 Cal.3d 470, [116 Cal.Rptr. 233, 526 P.2d 241]), "it would seem to follow that it is not, or at least not per se, the sort of crime which justifies the use of deadly force by a citizen in apprehending the criminal. [¶] In the latter case, as well as the former, the modern common law rule limits the use of deadly force to 'dangerous' felonies: 'The law does not permit the use of deadly force for the mere purpose of preventing a nondangerous felony, and a private person cannot defeat this restriction merely by saying his [or her] purpose is arrest rather than prevention.' [Citations.]" (*Quesada*, supra, 113 Cal.App.3d at p. 539, 169 Cal.Rptr. 881, first italics added, fn. omitted.)

However, in *People v. Martin* (1985) 168 Cal.App.3d 1111, [214 Cal.Rptr. 873] (*Martin* ), the Fifth District Court of Appeal affirmed the dismissal of an information under section 995 where the defendant, an off-duty deputy sheriff who lived next door to his son, interrupted a common law burglary of the son's house and, knowing no one was home at his son's house, shot and killed one of the fleeing burglars. (*Id.* at p. 1114, 214 Cal.Rptr. 873.) The court explained the conclusion in *Piorkowski*, supra, 41 Cal.App.3d 324, 115 Cal.Rptr. 830 that the felony committed must threaten death or great bodily harm was based on *People v. Jones* (1961) 191 Cal.App.2d 478, [12 Cal.Rptr. 777], a case interpreting section 197, subdivision (1), which provides that homicide is justified "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person." Pointing out *Jones* "dealt with a felony (wife-beating) not recognized at the time section 197 was enacted," the court went on to explain: "There are important differences between subdivisions 1 and 4 of section 197. Under subdivision 1, homicide is justifiable in resisting an attempt to murder, or to commit a felony, or to do some great

10

bodily injury. The language before and after 'to commit a felony' implies that the felony contemplated by that statute is one more dangerous than a personal assault. Additionally, at common law there was a broader privilege to use deadly force in arresting a felon than in preventing his [or her] criminal act. [Citation.]" (*Martin*, supra, 168 Cal.App.3d at p. 1118, 214 Cal.Rptr. 873.)

Distinguishing *Quesada*, supra, 113 Cal.App.3d 533, 169 Cal.Rptr. 881, the *Martin* court explained the instruction requested in that case "made no distinction between apprehension of the person who had committed the burglary while fleeing from the scene and apprehension after the felon had completed his [or her] escape. The social need for justification of a homicide committed in the latter circumstance, as in *Quesada*, is virtually nonexistent. In sharp contrast, failure to apprehend when the felon is fleeing the scene of the crime frequently means that the felon remains at large. Later investigation cannot represent a substitute for immediate apprehension. [Citation.] Accordingly, a person may reasonably expect that he [or she] is justified in using deadly force to apprehend a felon fleeing the scene of the crime. No such reasonable expectation could exist in attempting apprehension after escape. Other safer and less drastic procedures for apprehension after escape are well known." (*Martin*, supra, 168 Cal.App.3d at pp. 1122–1123, 214 Cal.Rptr. 873.) The court then found the "any felony" language of section 197, subdivision (4), to be ambiguous, construed the provision "'as favorably to the defendant as its language and the circumstances of its application may reasonably permit,'" and concluded the Legislature intended "to include in the definition of 'any felony' those crimes which were felonies at common law" when section 197 was enacted, "including nighttime burglary of a dwelling house." (*Id*. at p. 1123, 214 Cal.Rptr. 873.)

We agree with *Martin* on the meaning of "any felony" in the statute. However, *Piorkowski* turned not on this language, but on the meaning of "necessarily committed," holding a homicide is "necessarily committed" in attempting to apprehend a felon within the meaning of section 197, subdivision (4), "only where the felony committed is one which threatens death or great bodily harm." (*Piorkowski*, supra, 41 Cal.App.3d at pp. 328–330, 115 Cal.Rptr. 830.) In other words, as a matter of law, unless the felony threatens death or great bodily harm, the use of deadly force in apprehending the perpetrator is an unnecessary and unjustified use of force. Ordinarily, common law burglary would qualify. " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' " (*People v. Gauze* (1975) 15

11

Cal.3d 709, 715, [125 Cal.Rptr. 773, 542 P.2d 1365], quoting People v. Lewis (1969) 274 Cal.App.2d 912, 920, [79 Cal.Rptr. 650].) However, as *Quesada* explains, the fact there was a common law burglary does not, in and of itself, justify the use of deadly force in apprehending the perpetrator. (*Quesada*, supra, 113 Cal.App.3d at p. 539, 169 Cal.Rptr. 881 [common law burglary does not "per se" justify the use of deadly force by a citizen in apprehending the criminal].) There, it was not necessary for the defendant to attempt to apprehend the burglar at all. Where the burglary was committed two days before the attempted apprehension, there was plenty of time to enlist the professional assistance of law enforcement. *Martin* presents the more typical case of a common law burglary that is interrupted in progress. While the occupants of the home were elsewhere, the crime still threatened death or great bodily harm since they could return at any time, or, as happened, a neighbor could decide to investigate the situation and confront the burglars. And, unlike *Quesada*, there was no intervening period of two days rendering a citizen's arrest unnecessary.

Here, as in *Martin*, supra, 168 Cal.App.3d 1111, 214 Cal.Rptr. 873, defendant interrupted a common law burglary in progress. However, unlike *Martin*, there is no evidence defendant attempted to arrest Valdez. By his own account of events, defendant chased Valdez about a quarter mile with the axe and killed him, not in an attempt to arrest him for the burglary, but because, as he put it, "just the way he looked to me, dude, he ... wasn't a good person," and "these people are the type of people that are gonna threaten my life, dude." There was no attempted arrest; only a completed murder. Nor did defendant possess probable cause to arrest Valdez for burglary. After the only person defendant knew was involved in the burglary escaped by driving away, defendant went into the house and came back outside with an axe, saw Valdez on the side of the road, and simply assumed he was involved in the burglary. Neither defendant's assumption about Valdez's involvement nor the fact Valdez ran provided probable cause for arrest. Indeed, it is hard to imagine anyone who would have stayed put at the sight of an angry defendant approaching with an axe in the middle of the night. Without probable cause to arrest Valdez for burglary, the use of deadly force in making such an arrest was ipso facto unjustified. (*See Piorkowski*, supra, 41 Cal.App.3d at p. 328, 115 Cal.Rptr. 830.)

Defendant's claim of instructional error fails for a separate reason. As stated previously, "a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on ..., or if there is substantial evidence supportive of such a defense *and the defense is not inconsistent with the defendant's theory of the case*.'" ' [Citation.]" (*People v. Abilez*, supra, 41 Cal.4th at p. 517, 61 Cal.Rptr.3d 526, 161 P.3d 58, some italics added.) At trial, the defense conceded the killing was unlawful, but argued the crime was not murder, but voluntary manslaughter because defendant acted "rashly" and "impulsively" under intense provocation. The theory now

12

> advanced on appeal, that the killing was a justifiable homicide necessarily committed in attempting to apprehend Valdez for burglary, is inconsistent with defendant's theory of the case.
>
> We conclude the trial court had no sua sponte duty to instruct the jury on justifiable homicide.
>
> **Mistake of Fact**
>
> We also conclude the trial court had no sua sponte duty to instruct on mistake of fact. The "'defense' of mistake of fact requires, at a minimum, an actual belief 'in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act....' [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115, [155 Cal.Rptr.3d 236].) The circumstance about which defendant claims to have been mistaken is Valdez's status as a perpetrator or accomplice in the burglary of his house. Defendant does not assert this circumstance alone would make killing Valdez with multiple axe blows an innocent act. Instead, he argues: "In conjunction with [the justifiable homicide instruction,] the mistake-of-fact instruction would have made 'the act charged an innocent act.'" We have already explained the justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Thus, all that remains is defendant's mistaken belief Valdez was a burglar. Even if true, this circumstance does not insulate defendant from criminal liability. Accordingly, the mistake of fact instruction was not supported by substantial evidence. Moreover, mistake of fact is "not a true affirmative defense," but instead "serve[s] only to negate the mental state element of the crime.... Thus, even if substantial evidence supported an instruction on mistake of fact, the trial court had no duty to instruct on the defense sua sponte." (*People v. Lawson*, supra, 215 Cal.App.4th at p. 118, 155 Cal.Rptr.3d 236.)

*Zinda*, 233 Cal. App. 4th at 876-81. As previously noted, petitioner raised these arguments again in a petition to the California Supreme Court which was summarily denied. Lodg. Doc. No. 10 (Petition for Review); Lodg. Doc. No. 11 (Order Summarily Denying Petition for Review).

### A. Applicable Legal Standards

Jury instructions are generally matters of state law and, as such, federal courts are bound by a state appellate court's determination that a particular instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged

conviction, binds a federal court sitting in habeas corpus."). As such, "[f]ailure to give [a jury] instruction which might be proper as a matter of state law," by itself, does not merit federal habeas relief." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985)). In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely undesirable, erroneous, or even universally condemned, but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (internal quotations omitted). A challenge to a trial court's jury instructions is reviewed under the standards in *Brecht*, 507 U.S. at 637 – that is, whether the error had a substantial and injurious effect in determining the jury's verdict. *See California v. Roy*, 519 U.S. 2, 5 (1996).

### B. Analysis

As a preliminary matter, any contention that either the trial court or the Court of Appeal erred in their application of state law is not cognizable on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *see also Estelle*, 502 U.S. 62 at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). This well settled precedent prevents the court from revisiting the Court of Appeal's decision to distinguish the oft-referenced *People v. Martin* from the petitioner's own case. The only relevant question is whether the omission of justifiable homicide and mistake of fact jury instructions violated petitioner's due process rights.

#### 1. **Justifiable Homicide**

Petitioner argues that the trial court's failure to offer a justifiable homicide instruction precluded a meaningful opportunity to offer a complete defense. The justifiable homicide defense was never raised at trial, however. Instead, petitioner's trial counsel conceded that the killing was unlawful, but argued that it was voluntary manslaughter rather than murder. Lodg. Doc. No. 5 (Reporter's Transcript Vol. III) at 669. The Court of Appeal emphasized this discrepancy and held that the trial court had no duty to give instructions which were inconsistent with the defendant's own theory of the case. *Zinda*, 233 Cal. App. 4th at 880. Now, petitioner

argues that the Court of Appeal's finding of inconsistency was "nothing more than a smokescreen for a violation of Due Process." *Id*. at 32. The court cannot agree, however, insofar as it finds that no clearly established federal law requires trial courts to sua sponte give an instruction where a defendant has not requested it. *See Namet v. United States*, 373 U.S. 179, 190 (1963) ("We see no reason to require such extravagant protection against errors which were not obviously prejudicial and which the petitioner himself appeared to disregard."); *see also Drew v. Scribner*, 252 F. App'x 815, 818 (9th Cir. 2007) (holding that there are no Supreme Court cases holding that states are constitutionally required to give defense instructions sua sponte) (unpublished).

Petitioner points to *Mathews v. United States*, 485 U.S. 58, 63 (1988) and argues that it establishes that "a criminal defendant is entitled to any recognized defense for which there exists evidence for a reasonable jury to find in his favor." ECF No. 13 at 7. *Mathews* is easily distinguishable from the present case, however. Notably, the trial court in *Mathews* actually refused to allow the petitioner to argue entrapment. *Mathews,* 485 U.S. at 61-62. The trial court in this case never denied petitioner the opportunity to argue justifiable homicide; petitioner simply chose to pursue an entirely separate theory of the case. Moreover, nothing in *Mathews* speaks to the question of whether due process requires a trial court to offer defense instructions sua sponte. *See Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) ("[W]e conclude that when a Supreme Court decision does not squarely address[] the issue in th[e] case or establish a legal principle that clearly extend[s] to a new context to the extent required by the Supreme Court in . . . recent decisions it cannot be said, under AEDPA, there is clearly established Supreme Court precedent . . . .") (internal quotations and citations omitted).

Additionally, the court finds that the inconsistency between petitioner's theory of the case at trial and his theory on appeal precludes a finding that the failure to offer a justifiable homicide instruction had a substantial and injurious effect on the jury's verdict. Petitioner's strategy at trial was to convince the jury that he was guilty of the lesser offense of voluntary manslaughter rather than murder. Lodg. Doc. No. 3 (Reporter's Transcript Vol. I) at 154. As such, there is no basis on which to conclude that the trial court's failure to sua sponte offer defense instructions on justifiable homicide negatively affected the verdict.

Finally, the court notes that the Court of Appeal, after weighing the evidence, concluded that the defense was unwarranted because there was no indication that petitioner attempted to arrest the victim. *Zinda*, 233 Cal. App. 4th at 879-880. The factual findings of the Court of Appeal are accorded a presumption of correctness which the petitioner has the burden of rebutting by clear and convincing evidence. *Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir. 1990) ("Even though the state appellate court is, in a sense, in no better position than we are to evaluate the state trial court record, 28 U.S.C. § 2254(d) requires us to accord the same presumption of correctness to its factual findings."); 28 U.S.C. § 2254(e)(1). Petitioner has not met his burden of convincing the court that these determinations were erroneous. To the contrary, the Court of Appeal's findings are reasonable in light of the record. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable."); *Brown v. Poole*, 337 F.3d 1155, 1160 n.2 (9th Cir. 2003) ("We would indeed defer to all factual findings of the state court that are reasonable 'in light of the evidence presented in the state court proceedings.'") (quoting *Greene v. Henry*, 302 F.3d 1067, 1072 (9th Cir. 2002)). As such, petitioner was not entitled to a justifiable homicide instruction because a criminal defendant has no constitutional right to jury instructions on a theory of defense which is not supported by the evidence. *See Clark v. Brown*, 450 F.3d 898, 904-905 (9th Cir. 2006) ("When habeas is sought under 28 U.S.C. § 2254, [f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound *and evidence in the case makes it applicable*.") (emphasis added) (internal quotations omitted).

## 2. **Mistake of Fact**

As noted above, the Court of Appeal found that a justifiable homicide instruction was not supported by substantial evidence. It went on to note that, absent an accompanying instruction for justifiable homicide, "all that remains is defendant's mistaken belief Valdez was a burglar. Even if true, this circumstance does not insulate defendant from criminal liability. Accordingly, the mistake of fact instruction was not supported by substantial evidence." *Zinda*, 233 Cal. App. 4th at 881. The Court of Appeal also cited *People v. Lawson*, 215 Cal. App. 4th 108, 115, [155

16

Cal.Rptr.3d 236] (2013)[6] for the proposition that mistake of fact would serve only to negate the mental state element of the crime and therefore, even if substantial evidence supported the defense, the trial court had no duty to instruct on it sua sponte. *Zinda,* 233 Cal. App. 4th at 881.

Petitioner appears to concede that mistake of fact would not, on its own, have transformed the killing into an innocent act. Instead, he frames the mistake of fact defense as "a useful corollary to the justification instruction" and "a secondary aspect of the defense, already alluded to in other instructions; the primary necessary instruction is justification . . ." ECF No. 1 at 33. He goes on to argue that his honest mistake about the victim's involvement in the burglary emphasizes the necessity of the justification defense and states that the Court of Appeal "dodged this important aspect of the case" by first deciding that a justification defense was unwarranted. *Id.* This argument fails to satisfactorily address the question of how the omission of the mistake of fact instruction, viewed in isolation, would have altered the outcome of the trial, however.

Based on the foregoing, the court also concludes that the trial court's failure to offer a mistake of fact instruction sua sponte did not violate the petitioner's due process rights. Crucially, it has already found no reversible error with respect to the Court of Appeal's holdings on justifiable homicide. Accordingly, petitioner would be entitled to habeas relief only if he could demonstrate that the omission of the mistake of fact instructions, standing alone, had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 637. Petitioner has clearly not carried that heavy burden. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (holding that petitioner's burden is "especially heavy" where a trial court omitted an instruction because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). To the contrary, the weight of evidence indicates that the omission had no substantial and injurious effect.[7]

---

[6] *Lawson* held that "even if there had been sufficient evidence to support an instruction on the defense of mistake of fact, the trial court did not have a duty to instruct on the defense sua sponte, or on any other defense that served only to negate the intent element of the charged crime . . . ." *People v. Lawson*, 215 Cal. App. 4th 108, 111 (2013).

[7] Curiously, petitioner contends that this court should not employ the standard of review set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) because it is unclear whether the

17

## IV. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: October 16, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

Court of Appeal applied the standard of review for federal constitutional error set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967). ECF No. 1 at 24. First, the Court of Appeal had no reason to reach a *Chapman* error analysis because it found no error had occurred. Moreover, the *Brecht* standard applies regardless of whether the state appellate court reviewed an error for harmlessness under *Chapman*. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, . . . *whether or not* the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* . . . .") (emphasis in original) (internal citations omitted); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) ("Section 2254(d) thus demands an inquiry into whether a prisoner's claim has been adjudicated on the merits in state court; if it has, AEDPA's highly deferential standards kick in.").

18